Orick *et al. v.* State.*

(In Banc. October 5, 1925.)

[105 So. 465. No. 24841.]

1. Arrest. *Person may not be arrested without warrant, for misdemeanor not committed in officer's presence.*

Section 23 of the state Constitution of 1890, providing that the people shall be secure in their persons, houses, and possessions from unreasonable seizure or search, and no warrant shall be issued without probable cause, supported by oath or affirmation, specially designating the place to be searched and the person or thing to be seized, prohibits the arrest of a person without a warrant for a mere misdemeanor not committed in the officer's presence. *Butler* v. *State*, 135 Miss. 885, 101 So. 193, cited.

2. Criminal Law. *Evidence obtained by means of unlawful arrest or unlawful search and seizure is not admissible, and conviction based thereon will be reversed.*

In the case of an unlawful arrest or an unlawful search and seizure, evidence obtained by means of such unlawful arrest or search is not admissible in evidence against the accused on a crime charged involving the matters about which the arrest or search was made, and, if such evidence is admitted, a conviction will

be reversed. *Tucker* v. *State*, 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377, and other cases cited.

3. CRIMINAL LAW. *Searches and seizures. Statute providing that testimony of officer of intoxicating liquor, still, etc., in trial involving violation of prohibition laws, should not be inadmissible because officer did not have proper search warrant, held unconstitutional.*

Section 3 of chapter 244, Laws 1924, providing "the testimony of any lawful officer or officers and the introduction as evidence of any intoxicating liquor or any still or appliance or receptacle used in the manufacture or transportation or the attempted manufacture or attempted transportation of intoxicating liquor, in the trial of any criminal case involving a violation of the prohibition laws of the state of Mississippi, shall not be rendered inadmissible or incompetent, by reason of the fact that such officer, or officers, was not armed with a due and proper search warrant authorizing the search of the building, room in a building, place, or of the automobile or other vehicle in the course of which search the facts and information testified to were ascertained and discovered and the liquor, stills, and appliances for its manufacture or transportation were seized," is unconstitutional, being in conflict with sections 23 and 26 of the state Constitution of 1890.

McGowen, J., and Smith, C. J., dissenting.

---

*Headnotes 1. Arrest, 5 C. J., Section 31; 2. Criminal Law, 16 C. J., Section 1110; 3. Criminal Law, 16 C. J., Section 1110.

APPEAL from circuit court of Tishomingo county.

HON. C. P. LONG, Judge.

Hose Orick and Clovis Clingan were convicted of possessing intoxicating liquor, and they appeal. Reversed and remanded.

*T. A. Clark,* for appellants.

It is the contention of appellants that the officers could not testify against them because they are protected under the search and seizure provision (section 23 of the Constitution) requiring a warrant to seize as well as to

search and that this seizure was unlawful because these officers had no warrant and the record shows that they did not know that this was intoxicating liquor until after they illegally seized it.

7 Words & Phrases, First Series, 6400, defines the word "seize" as follows: "To seize is to take hold of suddenly and forcibly; to take possession of by force; in law seizure is the act of taking possession by virtue of an execution or legal authority." See *Vaughan* v. *State,* 101 So. 439.

At the time these officers threw their guns on the appellants they had these containers in their hands and so far as these officers knew, had not violated any law, and when they dropped these containers, when the officers told them to throw up their hands, and took the containers from the ground, this was a seizure by these officers, and it being a seizure without a warrant they could not testify.

The appellants had not committed a misdemeanor in the presence of these officers, as they did not know what was in the containers until after they picked them up. The defendants did not drop the containers until after the officers had thrown their guns in their faces, and demanded that they throw up their hands.

It was the unlawful act of the officers that put in motion the acts of the appellants in dropping the containers. This was a forcible seizure, and one which is in violation of the plain provisions of section 23 of the Constitution. The conduct of the officers was unlawful from beginning to end. *Butler* v. *State,* 101 So. 193.

*J. L. Byrd,* Assistant Attorney-General, for the state.

As we view this record, the only question in the case is whether or not the arrest of these parties, and the seizing of the liquor was legal. If legal, the cause should be affirmed, and if illegal, of course, it must be reversed. We see no way to save this case for the state unless this

court should overrule the case of *Butler* v. *State,* 101 So. 193, and *Vaughan* v. *State,* 101 So. 439.

For elaborate citation and discussion of authorities, relative to constitutionality of section 3, chapter 244, Laws 1924, see brief for state in *Donovan Moore* v. *State,* 138 Miss. 116, at 123-150.

ETHRIDGE, J., delivered the opinion of the court.

The appellants were indicted for unlawfully having intoxicating liquor in their possession, were convicted, and fined two hundred and fifty dollars each, and sentenced to a term of ninety days in the county jail, from which judgment they appealed.

Appellants were arrested without a warrant, and without any showing of probable cause for a belief by the officer that they had committed or were committing a crime. The officer making said arrest stated that there was a report of a disturbance over at a negro dance hall, and that he went over there and went to the back of the dance hall, and listened to see if he could catch onto what was happening; that these appellants came out meeting another; that he jumped out on them and told them to consider themselves under arrest and to put up their hands; that he picked up a fruit jar and a bottle which they dropped, which proved to contain whisky; Orick dropped the fruit jar and Clingan the bottle; that at the time he saw appellants he did not know what the fruit jar or the bottle contained, nor did he know what they had in their hands; that, at the time he drew his pistol on appellants and called on them to surrender, he did not know what was in their hands, nor does the testimony show that appellants were doing anything that would reasonably cause an officer to know or believe they were committing any offense or had committed any offense. The testimony offered was promptly and vigorously objected to and admitted over objection and exception.

In *Butler* v. *State,* 135 Miss. 885, 101 So. 193, we held that, where a policeman who had no warrant for defendant's arrest, and who did not know at the time he undertook to arrest defendant and search his possessions that defendant was committing a crime in his presence, who fired at defendant while defendant was running from him and caused the defendant to drop his sack, which the policeman searched without a warrant, such act was unlawful, and that evidence so obtained could not be admitted in evidence on the trial of the defendant for such crime. It was there held that an arrest could not be made for a misdemeanor without a warrant, unless the offense was committed in the officer's presence. This opinion cited *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377.

In the Tucker case just cited we held that, under section 23 of the Constitution, evidence unlawfully obtained by an officer, acting under color of office and without a warrant, could not be introduced in evidence against a defendant, in a prosecution for the offense which the evidence, unlawfully obtained by such officer, disclosed, holding that the Constitution gave protection to the person whose rights were so invaded, citing and following in that case *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Weeks* v. *United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; *Gouled* v. *United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; and *Amos* v. *United States,* 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654. We quoted from these cases, and held that, while the holding of the United States supreme court construing the federal Constitution against unlawful searches and seizures was not binding on the states, still we adopted the reasoning and conclusions of those decisions as being the proper construction of the protection intended to be afforded by section 23 of our state Constitution. The Tucker case was followed by several decisions shortly after its rendition, but was vigorously assailed in the

case of *Owens* v. *State,* 133 Miss. 753, 98 So. 233, and was carefully reconsidered by the court *in banc,* and, after the fullest and most deliberate and protracted consideration, the court adhered to the doctrine of the Tucker case, and has subsequently upheld the Tucker case and the doctrine therein announced in numerous cases in which the holding was predicated upon a construction of section 23 of the Constitution. Among the cases so holding are *Smith* v. *State,* 133 Miss. 730, 98 So. 344; *McCarthy* v. *Gulfport,* 134 Miss. 632, 99 So. 501; *Cuevas* v. *Gulfport,* 134 Miss. 644, 99 So. 503, *Taylor* v. *State,* 134 Miss. 110, 98 So. 459; *Rignal* v. *State,* 134 Miss. 169, 98 So. 444; *Falkner* v. *State,* 134 Miss. 253, 98 So. 691; *Butler* v. *State,* 135 Miss. 885, 101 So. 193; *Jordan* v. *State,* 135 Miss. 785, 100 So. 384; *Wells* v. *State,* 135 Miss. 764, 100 So. 674.

We might reverse this case with a simple statement that the holding by the court below was contrary to the doctrine therein announced, but for the fact that the legislature at its 1924 session enacted chapter 244, Laws of 1924; section 3 of which act reads as follows:

"The testimony of any lawful officer or officers and the introduction as evidence of any intoxicating liquor or any still or appliance or receptacle used in the manufacture or transportation or the attempted manufacture or attempted transportation of intoxicating liquor, in the trial of any criminal case involving a violation of the prohibition laws of the state of Mississippi, shall not be rendered inadmissible or incompetent, by reason of the fact that such officer, or officers, was not armed with a due and proper search warrant authorizing the search of the building, room in a building, place, or of the automobile or other vehicle in the course of which search the facts and information testified to were ascertained and discovered and the liquor, stills, and appliances for its manufacture or transportation were seized."

Section 23 of the Constitution, as construed by the court, commands the court to reject evidence obtained

by an officer in violation thereof. The legislature commands the courts to admit such evidence. Which shall we obey? Is the legislature capable of repealing or amending the Constitution by a simple legislative act passed as other statutes are passed, and not referred to the people as provided for in section 273 of the state Constitution? We are sworn to uphold and obey the Constitution. The Constitution is essentially superior to the legislature, and the fact is that the court's right and duty is to declare the statute passed in violation of the Constitution to be null and void and of no effect. Our own court, at an early date in the state's history, held acts of the legislature unconstitutional.

In *Thompson* v. *Grand Gulf Railroad & Banking Co.*, 3 How. (Miss.) 240, 34 Am. Dec. 81, our court, speaking through Chief Justice SHARKEY, the John Marshall of Mississippi jurisprudence, at page 247 of the said report, said:

"Several objections are made to the regularity of the proceedings of the circuit court, but it will be unnecessary to notice them in detail, as the case must be disposed of on the grave question of the constitutionality of the charter, taken and relied upon in the argument. That part of the charter which is said to conflict with the Constitution, is the latter clause of the first section of the amendment. The ground taken arises under the provision in the bill of rights, which declares that 'no person's property shall be taken or applied to public use without the consent of the legislature, and without just compensation first made therefor.'

"It is insisted that the compensation should be first made, and that a judgment is not compensation. On the other hand it is said that it is sufficient for the legislature to provide the means by which compensation is to be acquired. To determine between the Constitution and the legislature, is often embarrassing, and always demands a cautious and deliberate investigation. In the inquiry is involved the highest function of the judicial

department. The acts of the legislature should be sustained if possible; the Constitution must be preserved inviolate. We have approached this question under a due sense of its importance, and have given to it such investigation as the limit of our time would admit, and we are entirely satisfied with the correctness of the result to which that investigation has led.''

The result was that the court declared the act of the legislature void and of no effect, and the court has repeatedly exercised the power and right of declaring acts of the legislature in conflict with the Constitution to be void. When the Constitution of 1890 was ordained, the judicial power conferred therein on courts embraced the power to construe the Constitution and to declare acts of the legislature contrary to the Constitution as construed by the court to be void.

In *Bank of Hamilton* v. *Dudley,* 2 Pet. (U. S.) 492, 7 L. Ed. 496, the supreme court of the United States held that the judicial department of every government is the rightful expositor of its laws and emphatically of its supreme law; that in any case pending before any court, if the legislative act shall conflict with the Constitution, the court must exercise its judgment on both, and that the Constitution must control the act. The court must determine whether a repugnancy does or does not exist, and in making its determination must construe both instruments. That its construction of the one is authority, while its construction of the other is to be disregarded, is a proposition for which the court can perceive no reason. At page 507, 7 L. Ed. (2 Pet. 524), the court, speaking through Chief Justice MARSHALL, our greatest canonized judicial saint, said:

''It is also contended, that the jurisdiction of the court of common pleas, in testamentary matters, is established by the Constitution, and that the exclusive power of the state courts to construe legislative acts does not extend to the paramount law, so as to enable them to give efficacy to an act which is contrary to the Constitution.

"We cannot admit this distinction. The judicial department of every government is the rightful expositor of its laws; and emphatically of its supreme law. If, in a case depending before any court, a legislative act shall conflict with the Constitution, it is admitted, that the court must exercise its judgment on both, and that the Constitution must control the act. The court must determine whether a repugnancy does or does not exist; and in making this determination, must construe both instruments. That its construction of the one is authority, while its construction of the other is to be disregarded, is a proposition for which this court can perceive no reason."

In *Marbury* v. *Madison,* 1 Cranch, 176, 2 L. Ed. 60, Chief Justice MARSHALL asserted the power of the federal judiciary to pass upon an act of Congress and determine the constitutionality or unconstitutionality of statutes. This opinion has been accepted in all of the American courts as a correct pronouncement. At page 73, 2 L. Ed., pages 176 to 178 of 1 Cranch, the court said, referring to the federal Constitutions and the powers conferred on each of the departments:

"This original and supreme will organizes the government, and assigns, to different departments, their respective powers. It may either stop here, or establish certain limits not to be transcended by those departments. The government of the United States is of the latter description. The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the Constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the Constitution con-

trols any legislative act repugnant to it; or, that the legislature may alter the Constitution by an ordinary act.

"Between these alternatives there is no middle ground. The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written Constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable. Certainly all those who have framed written Constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the Constitution, is void.

"This theory is essentially attached to a written Constitution, and is consequently to be considered, by this court, as one of the fundamental principles of our society. It is not therefore to be lost sight of in the further consideration of this subject. If an act of the legislature, repugnant to the Constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory, and would seem, at first view, an absurdity too gross to be insisted on. It shall, however, receive a more attentive consideration.

"It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So if a law be in opposition to the Constitution, if both the law and the Constitution apply to a particular case, so that the court must either decide that case conformably to

the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law, the court must determine which of these conflicting rules governs the case.　This is of the very essence of judicial duty.

"If then the courts are to regard the Constitution, and the Constitution is superior to any ordinary act of the legislature, the Constitution, and not such ordinary act, must govern the case to which they both apply.　Those then who controvert the principle that the Constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the Constitution, and see only the law.　This doctrine would subvert the very foundation of all written Constitutions.　It would declare that an act, which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare, that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual.　It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits.　It is prescribing limits, and declaring that those limits may be passed at pleasure. That it thus reduces to nothing what we have deemed the greatest improvement on political institutions—a written Constitution—would of itself be sufficient, in America, where written Constitutions have been viewed with so much reverence, for rejecting the construction.　But the peculiar expressions of the Constitution of the United States furnish additional arguments in favor of its rejection."

It is familiar learning that the constitutional provisions are to be interpreted in the light of the common law as it existed at the time of the Revolution, and that the rights intended to be secured were the rights of Englishmen as they existed at the common law as understood at that time.

In *Ex parte Grossman*, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 378, the United States supreme court, in construing the constitutional powers of the President to pardon, as applied to a judicial punishment for contempt, said: "The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted. The statesmen and lawyers of the Convention who submitted it to the ratification of the Convention of the thirteen states, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood."

In *United States* v. *Wilson,* 7 Pet. 150, 8 L. Ed. 640, Chief Justice MARSHALL, construing the question of whether pardon should be pleaded in bar to be effective, said: "As this power had been exercised, from time immemorial, by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it."

In *Ex parte Wells,* 18 How. 307, 15 L. Ed. 421, another pardon case, the court said: "At the time of our separation from Great Britain, that power had been exercised by the king, as chief executive. Prior to the Revolution, the Colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-

America. At the time of the adoption of the Constitution, American statesmen were conversant with the laws of England, and familiar with the prerogatives exercised by the crown. Hence, when the words to grant pardons were used in the Constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the Colonies. At that time both Englishmen and Americans attached the same meaning to the word pardon. In the Convention which framed the Constitution, no effort was made to define or change its meaning, although it was limited in cases of impeachment.''

In *South Carolina* v. *United States,* 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737, the court was called upon to construe and decide upon the delimitation of powers of the nation and of the states. It said:

''In order to determine to what extent that implication will go we must turn to the condition of things at the time the Constitution was framed. What, in the light of that condition, did the framers of the Convention intend should be exempt? Certain it is that modern notions as to the extent to which the functions of a state may be carried had then no hold. Whatever Utopian theories may have been presented by any writers were regarded as mere creations of fancy, and had no practical recognition. It is true that monoplies in respect to certain commodities were known to have been granted by absolute monarchs, but they were not regarded as consistent with Anglo-Saxon ideas of government. The opposition to the Constitution came, not from any apprehension of danger from the extent of power reserved to the states, but, on the other hand, entirely through fear of what might result from the exercise of the powers granted to the central government. While many believed that the liberty of the people depended on the preservation of the rights of the states, they had no thought that those states would extend their functions beyond their then recognized scope or so as to imperil the life of the nation. . . .

''If we look upon the Constitution in the light of the common law we are led to the same conclusion. All the avenues of trade were open to the individual. The government did not attempt to exclude him from any. Whatever restraints were put upon him were mere police regulations to control his conduct in the business and not to exclude him therefrom.''

The same doctrine is announced in *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746.

In *Bram* v. *United States,* 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568, the court, construing the federal Constitution providing that a person in a criminal case shall not be compelled to testify against himself (168 U. S. at page 543, 18 S. Ct. 187, 42 L. Ed. 573), said: ''A brief consideration of the reasons which gave rise to the adoption of the Fifth Amendment, of the wrongs which it was intended to prevent, and of the safeguards which it was its purpose unalterably to secure, will make it clear that the generic language of the amendment was but a crystalization of the doctrine as to confessions, well settled when the amendment was adopted, and since expressed in the text-writers and expounded by the adjudications, and hence that the statements on the subject by the text-writers, and adjudications but formulate the conceptions and commands of the amendments itself. In *Boyd* v. *U. S.,* 116 U. S. 616 [6 S. Ct. 524, 29 L. Ed. 746], attention was called to the intimate relation existing between the provision of the Fifth Amendment securing one accused against being compelled to testify against himself, and those of the Fourth Amendment protecting against unreasonable searches and seizures; and it was in that case demonstrated that both of these amendments contemplated perpetuating, in their full efficacy, by means of a constitutional provision, principles of humanity and civil liberty, which had been secured in the mother country only after years of struggle, so as to implant them in our institutions in the fullness of their integrity, free from the possibilities of future legislative change. In com-

menting on the same subject in *Brown* v. *Walker,* 161 U.
S. 591, 596 [16 S. Ct. 647, 40 L. Ed. 819], the court,
speaking through Mr. Justice BROWN, said:

" 'The maxim, *Nemo tenetur seipsum* accusare, had its
origin in a protest against the inquisitorial and manifest-
ly unjust methods of interrogating accused persons, which
has long obtained in the continental system, and, until the
expulsion of the Stuarts from the British throne in 1688
and the erection of additional barriers for the protection
of the people against the exercise of arbitrary power, was
not uncommon even in England. While the admissions
or confessions of the prisoner, when voluntarily and free-
ly made, have always ranked high in the scale of incrim-
inating evidence, if an accused person be asked to ex-
plain his apparent connection with a crime under investi-
gation, the ease with which the questions put to him may
assume an inquisitorial character, the temptation to press
the witness unduly, to browbeat him if he be timid or
reluctant, to push him into a corner, and to entrap him
into fatal contradictions, which is so painfully evident in
many of the earlier state trials, notably in those of Sir
Nicholas Throckmorton and Udal, the Puritan minister,
made the system so odious as to give rise to a demand
for its total abolition. The change in the English crim-
inal procedure in that particular seems to be founded up-
on no statute and no judicial opinion, but upon a general
and silent acquiescence in the courts in a popular de-
mand. But, however adopted, it has become firmly im-
bedded in English as well as in American jurisprudence.
So deeply did the iniquities of the ancient system impress
themselves upon the minds of the American colonists that
the states, with one accord, made a denial of the right to
question an accused person a part of their fundamental
law, so that a maxim, which in England was a mere rule
of evidence, became clothed in this country with the im-
pregnability of a constitutional enactment.'

"There can be no doubt that long prior to our indepen-
dence the doctrine that one accused of crime could not be

compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was imbedded in that system as one of its great and distinguishing attributes."

Our own court, in construing the constitutional provision with reference to jury trial being preserved inviolate, in *Byrd* v. *State,* 1 How. (Miss.) 163, at page 177, said:

"As the law stood at the time of the formation of the federal government, both the common and statute law of England required the possession of a freehold as necessary to qualify a juror, and the right of trial by jury, being of the highest importance to the citizen, and essential to liberty, was not left to the uncertain fate of legislation, but was secured by the Constitution of this and all the other states as sacred and inviolable. The question naturally arises, How was it adopted by the Constitution? That instrument is silent as to the number and qualifications of jurors; we must therefore call in to our aid the common law for the purpose of ascertaining what was meant by the term jury. It is a rule that when a statute or the Constitution contains terms used in the common law, without defining particularly what is meant, then the rules of the common law must be applied in the explanation. The framers of the Constitution must have meant, therefore, to secure the right of trial by jury as it existed in England, either by the statute or comon law, and the Constitution, in the absence of all subsequent legislation, would have secured to the citizen this mode of trial and all its incidents not incompatible with the republican form of our government. The legislature cannot abolish or change substantially the panel or jury, but it may, it is presumed, prescribe the qualifications of the individuals composing it. Our statute nowhere defines the number necessary to constitute a jury; but the number twelve, known as the number at common law, is no doubt what is meant by the Constitution and all the statutes, when a jury is mentioned. If we have thus de-

rived the number and consider it secured by the Constitution, is it not also a fair inference that the incidents, such as the mode of selecting and the qualifications of the individual jurors, should also follow as necessary to the perfect enjoyment of the privilege? I think it does; and, if the position be correct, any juror not possessing the qualifications required in that country from which our constitutional privilege was taken, and to the regulations and laws of which the Constitution must be supposed to have referred, could have been successfully challenged, in the absence of a statutory regulation.''

With these principles in mind, let us reexamine the law as pronounced by numerous authorities upon the subject.

In *Butler* v. *State,* 135 Miss. 885, 101 So. 193, the statement that an officer at common law could not arrest a person for a misdemeanor not committed in his presence without a warrant is sustained by the overwhelming weight of authority.

In 2 R. C. L., p. 446, under heading, ''Authority of Officers at Common Law Generally,'' it is said:

''In England, under the common law, sheriffs, justices of the peace, coroners, constables, and watchmen were intrusted with special powers as conservators of the peace, with authority to arrest felons and persons reasonably suspected of being felons. Whenever a charge of felony was brought to their notice, supported by reasonable grounds of suspicion, they were required to apprehend the offenders, or at least to raise hue and cry, under penalty of being indicted for neglect of duty. Conservators of the peace also had the authority to make arrests without warrants in case of a misdemeanor which involved a breach of the peace committed in the presence of the officer making the arrest. The right to dispense with warrants in these instances probably had its origin in the necessity of preventing the escape of offenders during the period of delay incident to procuring warrants if such formality had been required. Although policemen were unknown to the common law, they are general-

ly considered as being the legal equivalent of watchmen, and, where public officials are expressly authorized by statute or by municipal ordinance to conserve the peace, they have, in making arrests, all the common-law authority of constables and watchmen, and may arrest any person who they, upon reasonable ground, believe has committed a felony, although it afterwards appears that no felony was actually perpetrated. This right of an officer to make an arrest for a felony is absolute, and exists in cases of felonies created by statute as well as those recognized by the common law, and a constable or other police officer is not bound to procure a warrant before making an arrest for a felony, although there may be no reason to fear an escape in consequence of delay in procuring the warrant."

In the case of *John Bad Elk* v. *United States,* 177 U. S. 529, 20 S. Ct. 729, 44 L. Ed. 874, the supreme court of the United States, discussing the right to arrest without warrant, said: "At common law, if a party resisted arrest by an officer without warrant, and who had no right to arrest him, and if in the course of that resistance the officer was killed, the offense of the party resisting arrest would be reduced from what would have been murder, if the officer had had the right to arrest, to manslaughter. What would be murder, if the officer had the right to arrest, might be reduced to manslaughter by the very fact that he had no such right. So an officer at common law was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence."

In *Kurtz* v. *Moffitt,* 115 U. S. 487, 6 S. Ct. 148, 29 L. Ed. 458, the court, in discussing the right to arrest in that case, said: "If a police officer or a private citizen has the right, without warrant or express authority, to arrest a military deserter, the right must be derived either from some rule of the law of England which has become part of our law, or from the legislation of Congress. By the common law of England, neither a civil

officer nor a private citizen had the right, without a warrant, to make an arrest for a crime not committed in his presence, except in the case of felony, and then only for the purpose of bringing the offender before a civil magistrate. 1 Hale, P. C. 587-590; 2 Hale, P. C. 76-81; 4 Bl. Comm. 292, 293, 296; *Wright* v. *Court,* 6 Dowl. & R. 623; S. C. 4 Barn. & C. 596. No crime was considered a felony which did not occasion a total forfeiture of the offender's lands or goods or both. 4 Bl. Comm. 94, 95; *Ex parte Wilson,* 114 U. S. 417, 423, 5 S. Ct. 935 [29 L. Ed. 89]. And such a forfeiture did not follow upon conviction by a court martial of a crime not punishable by the courts of common law. Co. Litt. 391a; 1 Clode, Mil. F. C. 176.''

It was also stated by the United States supreme court, in the case of *In re Swann,* 150 U. S. 637, 14 S. Ct. 225, 37 L. Ed.1207, that under the common law an officer did not have a right to make an arrest or search without a warrant.

In *Hughes* v. *State,* 145 Tenn. 544, 238 S. W. 588, 20 A. L. R. 639, the Tennessee court, in the first headnote to the case as reported in 20 A. L. R. 639, announces the rule: ''That one is engaged in violation of the law in the presence of officers does not justify his arrest without warrant, if the officers are not aware of such violation until the search made after his arrest.''

It is also said: ''To raise the question of admissibility of evidence because of alleged violation of a constitutional right it is not necessary to specify the particular section alleged to have been violated, but it is sufficient to call attention to the particular right alleged to have been infringed.''

Also: ''Where police officers arrest one on the highway without a warrant or evidence of commission of crime in their presence, evidence discovered by the search of his person and conveyance subsequently to the arrest cannot be utilized to secure his conviction.''

In 145 Tenn. at page 565, 238 S. W. 594, 20 A. L. R. 648, the court said: "The state, having through its executive representatives produced the evidence of a violation of the law by one of its citizens by means prohibited by the Constitution, cannot be permitted through its judicial tribunal to utilize the wrong thus committed against the citizen, to punish the citizen for his wrong; for it was only by violating his constitutionally protected rights that his wrong has been discovered. It is no answer to say that it matters not how a citizen's sins have been found out."

In *Pickett* v. *State*, 99 Ga. 12, 25 S. E. 608, 59 Am. St. Rep. 226, the supreme court of Georgia held that an arrest without warrant for a misdemeanor not committed in the presence of the officer was void, and that such officer had no right to arrest on suspicion, nor from information derived from others. The court said:

"The Constitution of this state expressly declares in the bill of rights that: 'The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated.' Code, section 5008. If any search is unreasonable and obnoxious to our fundamental law, it is one of the kind with which we are now dealing. Even if the person arrested did in fact have a pistol concealed about his person, the fact not being discoverable without a search, the offense of thus carrying it was not, in legal contemplation, committed in the presence of the officer, and the latter violated a sacred constitutional right of the citizen in assuming to exercise a pretended authority to search his person in order to expose his suspected criminality."

In the case of *In re Kellam*, 55 Kan. 700, 41 P. 960, a Kansas statute provided: "The city marshal or any policeman shall at all times have power to make or order an arrest upon view of an offense being committed, or upon reasonable suspicion that an offense has been committed, with or without process, for any offense against

the laws of the state or of the ordinances of the city, and to bring the offender for trial before the proper officer of the city: ' Provided, that any person arrested for any offense, without process shall be entitled, on de- mand before trial, to have filed a complaint on oath in writing; and such person shall not at that time be tried for any other offense than that for which he was ar- rested and for which the complaint shall be filed.'' Gen- eral Statutes 1889, section 623.

At page 702, 55 Kan. (41 P. 961), the court said: ''Un- der the common law, arrests without warrants were not permitted, except for offenses committed in the view of the officer; and, in cases of felony actually committed, the officer might also arrest without process upon a rea- sonable suspicion. The liberty of the citizen was so high- ly regarded, however, that the officer arresting the sup- posed felon without warrant must have acted in good faith, and upon grounds of probable suspicion that the person arrested was the actual felon. Felonies were ex- cepted on account of the gravity of such offenses, and because the public safety and the prompt apprehension of criminals charged with offenses so heinous seemed to require that such arrests should be made without war- rant. The powers of officers to make arrests have been extended to some extent by statutes, but it is generally held that officers cannot be constitutionally clothed with authority to arrest without warrant for minor offenses not committed in their presence or view. *Pinkerton* v. *Verberg,* 78 Mich. 573, 44 N. W. 379 (7 L. R. A. 507, 18 Am. St. Rep. 473); *Robison* v. *Miner,* 68 Mich. 549, 37 N. W. 21; *Shanley* v. *Wells,* 71 Ill. 78; *Jamison* v. *Gaer- nett,* 10 Bush, 221; *State* v. *Freeman,* 86 N. C. 683; *Doer- ing* v. *State,* 49 Ind. 56, 19 Am. Rep. 669; 11 Cent. Law J. 321; 1 Am. & Eng. Ency. Law, 732; 7 Am. & Eng. Ency. Law, 675.''

To the same effect is the case of *Douglass* v. *State,* 152 Ga. 379, 110 S. E. 168, which was a trial for the homi- cide of a sheriff, killed while attempting to arrest one

on suspicion that he was illegally transporting liquor concealed in an automobile, which decision held that an instruction to the effect, *inter alia,* that an officer has a right to arrest without a warrant one who is committing an offense in his presence was erroneous under the circumstances; the basis of the decision being that the offense was not committed in the presence of the officer. See, also, *Caffinni* v. *Hermann,* 112 Me. 282, 91 A. 1009; *State* v. *Lutz,* 85 W. Va. 330, 101 S. E. 434; *Roberson* v. *State,* 43 Fla. 156, 29 So. 535, 52 L. R. A. 751; *Hughes* v. *State,* 2 Ga. App. 29, 58 S. E. 390; *Stewart* v. *State,* 2 Ga. App. 98, 58 S. E. 395; *Ballard* v. *State,* 43 Ohio St. 340, 1 N. E. 76; *Rasey* v. *Ciccolino,* 1 Ohio App. 198; *State* v. *Freeman,* 86 N. C. 683; *State* v. *Evans,* 161 Mo. 95, 61 S. W. 590, 84 Am. St. Rep. 682, and case note.

The cases on search and seizure and arrest growing out of the violation of section 23 of the Constitution of Mississippi, and similar sections in the Constitution of the United States and of the other states of the Union, are governed by the same rules and principles, and the great weight of modern authority supports the doctrine that evidence illegally obtained by an officer cannot be received over the objection of the defendant, on a trial against him resulting from such discovery, or for which he is being prosecuted.

The doctrine that such evidence may be received is a pernicious one which destroys the protection of the Constitution. It would be just as logical and just as righteous to permit evidence extorted by torture to be received on trial of a defendant. A prisoner might be placed upon the rack or wheel and his muscles stretched and bones broken until human fortitude could stand it no longer and the evidence so extorted be offered on the theory that the court was not concerned as to how the evidence was obtained. The cases of *State* v. *Kees,* 92 W. Va. 277, 114 S. E. 617, 27 A. L. R. 684; *Hoyer* v. *State,* 180 Wis. 407, 193 N. W. 89, 27 A. L. R. 673; *People* v. *Castree,* 311 Ill. 392, 143 N. E. 112, 32 A. L. R. 357;

*State* v. *Owens,* 302 Mo. 348, 259 S. W. 100, 32 A. L. R. 383, and *Ex parte Rhodes,* 202 Ala. 68, 79 So. 462, 1 A. L. R. 568, all are able discussions of the principles involved, and support the doctrine of this court as announced in *Tucker* v. *State* and subsequent decisions. The notes appended to these cases in the A. L. R. reports refer to a number of other authorities supporting the same doctrine, and a careful tracing of the authorities will show that most of the states since the decision of the *Boyd case, supra,* by the United States supreme court, have adopted the rule therein adopted, many of the states overruling prior decisions holding to the contrary. A number of the states had held to the contrary prior to the decision of the Boyd case, and under the doctrine of *stare decisis* adhered to the former opinions, although some of them expressed the view that, if the question were a new question, they would adopt the position of the United States supreme court.

The recent case of *Carroll and Kiro* v. *United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 347, by the United States supreme court, does not change the rule announced in the former cases, but expressly recognized that, if the search or seizure were illegal, the evidence would be excluded under them.

That neither search nor seizure could exist at the common law without a warrant founded upon affidavit, except as above stated, was clearly established in the cases of *Entick* v. *Carrington,* 19 How. St. Tr. 1030, 24 King's Bench, 275, 95 Eng. (Reprint) 807, and *Money* v. *Leach,* 3 Burrell (Eng.) 1742, 97 Eng. Rep. (Reprint) 1075; *The Bishop of Atterbury's case,* 16 How. St. Tr. 490; and *The Wilkes case,* 19 How. St. Tr. 1405.

In order that the common law on this point may be brought to the minds of all readers of this opinion, I desire to set out that part of the opinion in *Entick* v. *Carrington,* discussing the common-law right of searches and seizures (95 Eng. Rep. [Reprint] at page 817 et seq.), which reads as follows:

"The defendants having failed in their defense under the Statute 24 Geo. 2; we shall now consider the special justification, whether it can be supported in law, and this depends upon the jurisdiction of the secretary of state; for if he has no jurisdiction to grant a warrant to break open doors, locks, boxes, and to seize a man and all his books, etc., in the first instance upon an information of his being guilty of publishing a libel, the warrant will not justify the defendants. It was resolved by B. R., in the case of *Shergold* v. *Holloway*, that a justice's warrant expressly to arrest the party will not justify the officer, there being no jurisdiction. 2 Stran. 1002. The warrant in our case was an execution in the first instance, without any previous summons, examination, hearing the plaintiff, or proof that he was the author of the supposed libels, a power claimed by no other magistrate whatever (SCROGGS, C. J., always excepted). It was left to the discretion of these defendants to execute the warrant in the absence or presence of the plaintiff, when he might have no witnesses present to see what they did; for they were to seize all papers, bank bills, or any other valuable papers they might take away if they were so disposed; there might be nobody to detect them. If this be lawful, both Houses of Parliament are involved in it, for they have both ruled that privilege doth not extend to this case. In the case of Wilkes, a member of the Commons House, all his books and papers were seized and taken away; we were told by one of these messengers that he was obliged by his oath to sweep away all papers whatsoever. If this is law, it would be found in our books, but no such law ever existed in this country. Our law holds the property of every man so sacred that no man can set his foot upon his neighbor's close without his leave. If he does, he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law. The defendants have no right to avail themselves of the usage of these warrants since the Revolu-

tion, and, if that would have justified them, they have not averred it in their plea, so it could not be put, nor was in issue at the trial; we can safely say there is no law in this country to justify the defendants in what they have done; if there were, it would destroy all the comforts of society; for papers are often the dearest property a man can have. This case was compared to that of stolen goods; Lord Coke denied the lawfulness of granting warrants to search for stolen goods (4 Inst. 176, 177), though it now prevails to be law; but in that case the justice and the informer must proceed with great caution. There must be an oath that the party has had his goods stolen, and his strong reason to believe they are concealed in such a place; but, if the goods are not found there, he is a trespasser. The officer in that case is a witness; there are none in this case, no inventory taken; if it had been legal, many guards of property would have attended it. We shall now consider the usage of these warrants since the Revolution; if it began then, it is too modern to be law. The common law did not begin with the Revolution; the ancient Constitution, which had been almost overthrown and destroyed, was then repaired and revived; the Revolution added a new buttress to the ancient venerable edifice. The K. B. lately said that no objection had ever been taken to general warrants. They have passed *sub silentio*. This is the first instance of an attempt to prove a modern practice of a private office to make and execute warrants to enter a man's house, search for and take away all his books and papers in the first instance, to be law, which is not to be found in our books. It must have been the guilt or poverty of those upon whom such warrants have been executed that deterred or hindered them from contending against the power of a secretary of state and the solicitor of the treasury, or such warrants could never have passed for lawful till this time. We are inclined to think the present warrant took its first rise from the Licensing Act, 13 & 14 Car. 2, chapter 33, and are all of the opinion that

it cannot be justified by law, notwithstanding the resolution of the judges in the time of Chas. 2, and Jac. 2, that such search warrants are lawful. State Trials, vol. 3, p. 58, the trial of Carr for libel. There is no authority but of the judges of that time that a house may be searched for a libel, but the twelve judges cannot make law; and, if a man is punishable for having a libel in his private custody, as many cases say he is, half the kingdom would be guilty in the case of a favorable libel, if libels may be searched for and seized by whomsoever and wheresoever the secretary of state thinks fit. It is said it is better for the government and the public to seize the libel before it is published; if the legislature be of that opinion, they will make it lawful. Sir Samuel Astry was committed to the Tower, for asserting there was a law of state distinct from the common law. The law never forces evidence from the party in whose power it is; when an adversary has got your deeds, there is no lawful way of getting them again but by an action. 2 Stran. 1210, the King and Cornelius; the King and Dr. Purnell, Hil. 22 Geo. B. R. Our law is wise and merciful, and supposes every man accused to be innocent before he is tried by his peers; upon the whole, we are all of opinion that this warrant is wholly illegal and void. One word more for ourselves; we are no advocates for libels, all governments must set their faces against them, and, whenever they come before us and a jury, we shall set our faces against them; and, if juries do not prevent them, they may prove fatal to liberty, destroy government, and introduce anarchy; but tyranny is better than anarchy, and the worst government better than none at all.''

It follows from what we have said that the judgment of the court below will be reversed, and the cause remanded.

*Reversed and remanded.*

140 Miss.—14.

McGOWEN, J. (dissenting).

For the reason that I cannot bring myself to the conclusion reached by the majority of my brethren, I dissent in this case, and shall briefly set forth my reasons for so doing.

The majority opinion declares section 3, chapter 244, Acts of 1924, making competent the testimony of any lawful officer, and permitting the introduction as evidence of any intoxicating liquors or any still or appliances used in the manufacture or transportation of intoxicating liquors, in the trial of any criminal case involving the prohibition laws of this state, whether procured by such officer by virtue of a search warrant or not, to be unconstitutional and void.

I am not unmindful of the announcemet by this court in the *Tucker case,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377, rendered prior to the enactment of said section. Nor am I unmindful of the announcement by a divided court in the case of *Owens* v. *State,* 133 Miss. 753, 98 So. 233, and I do not now intend to incorporate in this dissenting opinion all of the arguments which are written in the jurisprudence of our country in favor of upholding this statute, but shall content myself with a partial citation of authorities, deeming it unwise to incumber the record with a lengthy statement of conceded principles recognized by the bench and bar as having long since been settled; for instance, that the courts of the land have a right to construe legislation in the light of the Constitution, and, if the courts find beyond reasonable doubt that a statute violates the fundamental law, to so declare; that the search and seizure sections of the Constitution of the United States and like sections of our own Constitution are wise and beneficent, and are designed to protect the citizen from unlawful searches and seizures, and designed to protect him from being forced to testify against himself in any criminal prosecution. These matters are not subject to debate, and, so far as I am concerned, I cheer-

fully and gladly will go the limit in the enforcement of the individual rights of citizens from unlawful and unwarranted interference in the light of these wise and beneficent sections of our national and state Constitutions.

A brief study of the decisions of the courts of our land reveal to me that thirty-five of the forty-eight states have held that there is no intimate connection between the proposition that a man may not be forced to give evidence against himself, and an unwarranted search and seizure, and, as contended .for here, that the testimony of an officer, acting unlawfully as to what he saw and heard while engaged in an unlawful trespass, without any warrant, should thereby and because thereof be rendered incompetent.

In support of the proposition which I conceive to be the law, that evidence otherwise relevant and material will not be rendered inadmissible because illegally obtained, I cite the following cases holding to the rule stated: Alabama—*Banks* v. *State,* 207 Ala. 179, 93 So. 293, 24 A. L. R. 1359. Arizona—*Argetakis* v. *State,* 24 Ariz. 599, 212 P. 372. Arkansas—*Benson* v. *State,* 149 Ark. 633, 233 S. W. 758. California—not cited. Colorado—*Sullivitch* v. *People,* 71 Colo. 376, 206 P. 789. Connecticut—*State* v. *Reynolds,* 101 Conn. 224, 125 A. 636. Delaware—*State* v. *Chuchola* (Del. Gen. Sess.), 120 A. 212. Idaho—*State* v. *Anderson,* 31 Idaho, 514, 174 P. 124. Iowa—*State* v. *Tonn,* 195 Iowa, 94, 191 N. W. 530. Kansas—*State* v. *Turner,* 82 Kan. 787, 109 P. 654, 32 L. R. A. (N. S.) 772, 136 Am. St. Rep. 129; Louisiana—*State* v. *Davis,* 154 La. 405, 97 So. 590. Maine—*State* v. *Chorosky,* 122 Me. 283, 119 A. 662. Maryland—*Lawrence* v. *State,* 103 Md. 17, 63 A. 96. Massachusetts—*Com.* v. *Wilkins,* 243 Mass. 356, 138 N. E. 11. Michigan—*People* v. *Kamhout,* 227 Mich. 172, 198 N. W. 831. Minnesota—*State* v. *Pluth,* 157 Minn. 145, 195 N. W. 789. Nebraska—*Billings* v. *State,* 109 Neb. 596, 191 N. W. 721. New Hampshire— *State* v. *Agalos,* 79 N. H. 241, 107 A. 314. New Jersey— *State* v. *Eldredge,* 118 A. 242. New Mexico—*State* v.

*Barela,* 23 N. M. 395, 168 P. 545, L. R. A. 1918B, 844. New York—*People* v. *Esposito,* 118 Misc. Rep. 867, 194 N. Y. S. 328. Nevada—*State* v. *Chin Gim,* 47 Nev. 431, 224 P. 798. North Carolina—*State* v. *Godette,* 29 N. C. 210; *State* v. *Simmons,* 183 N. C. 684, 110 S. E. 591. North Dakota—*State* v. *Dinger* (N. D.), 199 N. W. 196. Ohio—*Rosanski* v. *State,* 106 Ohio St. 442, 140 N. E. 370, Oregon—*State* v. *Goldstein,* 111 Or. 221, 224 P. 1087. Pennsylvania—*Com.* v. *Klein,* 81 Pa. Super. Ct. 55. South Carolina—*State* v. *Maes,* 127 S. C. 397, 120 S. E. 576. South Dakota—*City of Sioux Falls* v. *Walser,* 45 S. D. 417, 187 N. W. 821. Texas—*Rippey* v. *State,* 86 Tex. Cr. R. 539, 219 S. W. 463. Utah—*State* v. *Aime,* 62 Utah, 476, 220 P. 704, 32 A. L. R. 375. Vermont—*State* v. *Krinski,* 78 Vt. 162, 62 A. 37. Virginia—*Hall* v. *Commonwealth,* 138 Va. 727, 121 S. E. 154. Washington—*State* v. *Basil,* 126 Wash. 155, 217 P. 720.

In the cases *supra* the very question raised here in the instant case was presented to these courts, and these cases uphold the constitutionality of a statute such as we have under consideration here. I shall not undertake to burden the record with a review of each of these cases, and shall only notice a few of them in order to show how this this question is viewed in other jurisdictions.

In *Venable* v. *State,* 156 Ark. 564, 246 S. W. 860, the supreme court of Arkansas held in effect that where dynamite procured by conspirators for sabotage was seized on private premises under a warrant alleged to be defective, the evidence of what the officers saw and heard was admissible, even if they had no warrant at all.

In *People* v. *Mayen,* 188 Cal. 237, 24 A. L. R. 1383, 205 P. 435, the supreme court of California said: "It must be admitted, then, that the search and seizure was unreasonable and unlawful. . . . The trespass committed . . . and the subsequent use of the [seized articles] in evidence . . . were in legal effect entirely distinct transactions with no necessary or inherent relation to each other."

And the evidence was held to be properly admitted.

In *State* v. *Reynolds,* 101 Conn. 224, 125 A. 636, from the supreme court of Connecticut, the officer took a bottle of whisky from the pocket of a restaurant keeper, and the court held, with reference to the admissibility of the whisky and the testimony of the officer, that the same was competent, notwithstanding section 9, art. 1, of their state Constitution, in effect the same as ours citing an abundance of authority. Among other things, the court said: "The accused was not compelled by the court to give evidence against himself. All that the court did was to admit in evidence an article taken from the accused, together with a statement of the circumstances surrounding the taking. It was all admissible evidence unless it should have been excluded until the court had ascertained whether it had been obtained illegally, and thereupon to have permanently excluded it."

Then cites the case of *State* v. *Flynn,* 36 N. H. 64, and quotes with approval from the opinion in that case the following: "The information thus acquired is not the admission of the party, nor evidence given by him, in any sense. The party has in his power certain mute witnesses, as they may be called, which he endeavors to keep out of sight, so that they may not disclose the facts which he is desirous to conceal. By force or fraud access is gained to them, and they are examined, to see what evidence they bear. That evidence is theirs, not their owners. See *Shields* v. *State,* 104 Ala. 35, 16 So. 85, 53 Am. St. Rep. 17."

In the case of *State* v. *Reynolds, supra,* the court further said: "To hold otherwise is to find, as *Tucker* v. *State,* 128 Miss. 211, 90 So. 847, 24 A. L. R. 1377, forcibly expresses it, an identity between compelling a witness to speak and using in evidence material taken from him by force or fraud. To use there is no such similitude. The wrong done by the taking is to the rights of the accused and to the cause of justice; neither can be properly protected save by a remedy in a direct proceeding. In a col-

lateral proceeding the court is without power to improvise a remedy to enforce the rights of either the accused or the state for a wrong not before the court. . . . Sound public policy forbids the exclusion of evidence, otherwise admissible, though illegally obtained. When evidence tending to prove guilt is before a court, the public interest requires that it be admitted. It ought not to be excluded upon the theory that individual rights, under these constitutional guaranties are above the right of the community to protection from crime. . . . The burden ought not to be added to by giving to our constitutional guaranties a construction at variance with that which has prevailed for over a century at least.''

In concluding the Connecticut court, having reviewed the numerous authorities, asks and answers the question raised by the majority opinion inferentially as follows (101 Conn. 238, 125 A. at page 640):

''If the question recurs, Where is the accused's remedy? The answer must be, by a civil action, the only form of remedy known for the protection of the individual against a trespass. It may be that the officer would be guilty of a contempt. If violations of these constitutional rights shall multiply, undoubtedly the General Assembly can provide for a penalty for subsequent violations. A penalty upon an officer for an illegal search made without reasonable ground would furnish adequate protection against such a public wrong. The creation of such a crime must be left to the legislative department of government. No such crime exists under our common law.''

In *State* v. *Chuchola,* 120 A. 212, the court of general sessions of Delaware held, in a case where the police without warrant searched defendant's residence and seized liquor, that such seizure is illegal and the officer making it might be punished for his unlawful act; held that the liquor seized was admissible as evidence, even though illegally secured, and said: ''We do not believe the Constitution makers meant to be so solicitous for the interests of a person accused of crime as to exclude from the jury,

not only the evidence of his guilt, but the thing, the possession of which constitutes his crime."

In the case of *Commonwealth* v. *Wilkins*, 243 Mass. 356, 138 N. E. 11, where liquor was taken from defendant's person by an officer acting without any kind of warrant, the court said: "Courts do not impose an indirect penalty upon competent evidence because of illegality in obtaining it. . . . Whether he commits a crime or a civil wrong, the offending officer alone is responsible. . . . The wrong committed in seizing the liquor without a warrant was a transaction by itself. It has no necessary connection with its subsequent use as evidence. . . . Courts commonly do not concern themselves with the adjustment of property rights between wrongdoers contending as to possession of that which the law does not recognize as innocent and innocuous. The law leaves the parties where they put themselves."

In *People* v. *Esposito*, 118 Misc. Rep. 867, 194 N. Y. S. 326, where a policeman saw the defendant look furtively at him, and the policeman advanced toward defendant, who moved away, followed by the officer, and the defendant increased his gait as the officer increased his, until the officer finally ordered the defendant to throw up his hands, and, feeling something hard in defendant's pocket, removed a loaded revolver which was being carried by defendant in violation of their statute. The court held that the arrest was lawful for the commission of a crime in the officer's presence and said further:

"But, if it were conceded and and indisputable that the officer's acts were utterly without justification and constituted unlawful search and seizure, forbidden by the civil rights law (Consol. Laws, chapter 6, section 8), the evidence disclosed thereby is nevertheless available, if produced on the trial, for use in maintaining this prosecution. . . . Courts exists to accomplish justice in the actual world of living human beings, and in such accomplishment it is indispensable to find the truth; therefore the rules of evidence generally sanction the pursuit of

truth whereever it may be found and from whatever sources it may be available.''

I have cited cases sustaining my contention from the courts of thirty-five states; a majority of the cases being liquor cases, there being no material difference in the sections of the several Constitutions. A majority of the circuit courts of appeal of the United States have held to this same view.

The Boyd case and other cases cited in the majority opinion do not, in my judgment, approach the question here under review when we consider that in the state of Mississippi a defendant has no property rights in whisky or other intoxicating liquors. Intoxicating liquors are contraband in this state. One who has intoxicating liquors in his possession is violating the law, and, in my opinion, the supreme court of the United States will not apply the rule announced in the Boyd case, as to the use of private papers as evidence, to a case like the one at bar, where the defendants have the liquor in the presence of the officer in violation of our statute.

I cannot bring myself to believe that I could be warranted in following cases not directly in point, few in number comparatively, as against the overwhelming weight of authority that such evidence is admissible though unlawfully obtained. Aye, I must go further and say that I believe beyond a reasonable doubt that all these appellate jurisdictions, dealing directly with the very question here under review and being directly in point, are mistaken, and that the case of *Boyd* v. *United States,* and other cases cited, not directly in point, and not dealing with a contraband article unlawfully seized, are correct. I do not believe the reasoning is sound as advanced by the majority opinion, nor do I believe that there is any danger to the citizen from ruthless officers comparable to the danger and menace to organized society if we permit the criminal to sit in the witness chair and testify as a witness in the very presence of the products of his crime, and seal the lips of the officer chosen by our law.

It does not appear to me to be right. It does not appear to me to be a sound construction of sections 23 and 26 of our Constitution. It does not appear to be in harmony with reason and logic, and I cannot subscribe to it nor allow it to go to record without entering this expression of my views.

Chief Justice SMITH desires me to say that he concurs in the views herein expressed.