IUPE *v.* STATE.*

(Division B.    Oct. 19, 1925.)

[105 So. 20.    No. 24762.]

CRIMINAL LAW. ˙ *Searches and seizures. Intoxicating liquor taken by officer attempting to arrest illegally without warrant held not admissible in evidence over objection.*

Where a person was sought to be arrested without a warrant for a misdemeanor not committed in the presence of the officer, and such officer, in attempting to make such arrest without warrant, enters the premises of the person sought to be arrested against his will and consent, and there discovers intoxicating liquors in his possession, such evidence is not admissible on a charge founded on such information over the objection of the defendant.

*Headnote 1.   Criminal Law, 16 C. J., Section 1110; Searches and Seizures, 35 Cyc., p. 1272.   Admissibility of evidence obtained by illegal search and seizure, see notes in 24 A. L. R. 1408; 32 A. L. R. 408; 10 R. C. L., pp. 933, 934; 4 R. C. L. Supp., p. 679, et seq.; 5 R. C. L. Supp., p. 573, et seq.

APPEAL from circuit court of Hinds county.

HON. W. H. POTTER, Judge.

Samuel Iupe was convicted of unlawfully possessing intoxicating liquors, and he appeals. Reversed and remanded.

*W. T. Horton* and *L. M. Burch,* for appellant.

The only time in the evidence, fixed for the commitment of the crime was "one Saturday night," which might have been ten years ago or the past Saturday night, nor was the offense proved to be committed after the passage of the act alleged to have been violated. This court has held "in order to sustain a conviction of crime, the state must prove that the offence was committed within the statutory period of limitation, and in order to permit the imposition of a penalty prescribed by a particular statute, it must prove that the offense was committed after the passage of the statute," *McLaughlin* v. *State,* 98 So. 148, and the authorities cited therein, therefore, we respectfully submit that the verdict of the jury was contrary to the law and evidence, and that this case should be reversed and remanded.

At the time the appellant was arrested, he had committed no crime, nor did the officer have a warrant for his arrest, nor a search warrant for the premises. The officer testified that he went in to arrest the appellant and it was then that he grabbed up a jug and ran into the back yard. It was not until the officer had invaded the home of the appellant that he found any whiskey. So we respectfully submit that in the first place the arrest was illegal under section 1204, Hemingway's Code, as the appellant had committed no crime, and that the evidence was secured in an illegal manner; hence, the court erred in admitting the evidence.

*F. S. Harmon,* assistant attorney-general, for the state.

The only reference in this record relating to the time of the alleged offense, is the statement by the sole wit-

ness in the case, Police Officer J. D. Dixon, to the effect that "we sent a negro in there one Saturday night to buy two bottles of jake, and he bought the jake and a coca cola and brought it out to us."

In the light of *McLaughlin* v. *State*, 98 So. 148, where a case was reversed where the testimony in the record was to the effect that "During the Neshoba County Fair, in the month of August, the appellant was found in possession of liquor," we submit this case without argument.

ETHRIDGE, J., delivered the opinion of the court.

Appellant was convicted of having unlawfully in his possession vinous, spirituous, alcoholic, and intoxicating liquors, and was convicted, fined, and sentenced to imprisonment in the county jail for a term of sixty days, and appeals.

The state, to make out its case, introduced a policeman of the city, who testified over objection that he sent a darkey into a store of the appellant to see if he could buy intoxicating liquors, and such person returned and reported that he had bought some Jamaica ginger; that he gave such person marked money with which to make the purchase; that on receiving such report he went to the store of the appellant for the purpose of making arrest without having procured a warrant for such arrest, and without having made an affidavit charging appellant with any crime; that when he entered the store the appellant went into the back part of the building which he occupied as a living room, and on out at the back door; that he followed him into said room and threw his searchlight upon him, he being then in the yard back of the house, and by means of the searchlight he saw the appellant hiding a jug in the weeds; that he did not know that appellant had the jug until he threw such searchlight upon him, and he could not have discovered the possession thereof without having gone into the

store and room; that he arrested appellant and seized the jug, and found that it contained intoxicating liquors, to-wit, a gallon of whiskey; that all this occurred in the city of Jackson in the first district of Hinds county. This was the only testimony introduced, and was objected to because obtained in violation of section 23 of the Constitution. This arrest and search were made after the enactment of chapter 244, Laws of 1924, section 3 of which act authorizes the receipt in evidence of evidence obtained by officers as a result of either a search or an arrest without a warrant. The court below acted upon section 3 of said chapter 244, Laws of 1924, in admitting the evidence.

In the cases of *Rich Gardner* v. *State* (No. 24879), 105 So. 475, and *Hose Orick and Clovis Clingan* v. *State* (No. 24841), 105 So. 465, decided October 5, 1925, we held that section 3, chapter 244, Laws of 1924, was unconstitutional, and that the rule was announced in *Tucker* v. *State,* 128 Miss. 211, 90 So. 845, 24 A. L. R. 1377, and *Owens* v. *State,* 133 Miss. 753, 98 So. 233, and other cases referred to in the opinions delivered October 5, 1925, that such evidence obtained in violation of section 23 of the Constitution would not be received against a defendant on a trial for crime growing out of the transactions in which such seizure or unlawful arrest was made. The authorities have been fully collected in previous decisions both for and against the rule which we adopted in these cases. It will be unnecessary to rediscuss those authorities.

However, as there is a tendency to encroach upon the constitutional provisions manifested of late years, and apparently a growing disposition to sweep aside these provisions, it may be well to refer to some historical data pertaining to the subject of liberty and the necessity for its security against official power.

Mr. Hallam, in his Constitutional History of England, in the beginning of his work, on page 2, in discussing the

encroachments made upon English constitutional rights, beginning with Henry VII, said:

"This liberty has been the slow fruit of ages, still waiting a happier season for its perfect ripeness, but already giving proof of the vigour and industry which had been employed in its culture. I have endeavored, in a work of which this may in a certain degree be reckoned a continuation, to trace the leading events and causes of its progress. It will be sufficient in this place briefly to point out the principal circumstances in the policy of England at the accession of Henry VII.

"The essential checks upon the royal authority were five in number: (1) The king could levy no sort of a new tax upon his people, except by the grant of his parliament, consisting as well of bishops and mitred abbots or lords spiritual, and of hereditary peers or temporal lords, who sat and voted promiscuously in the same chambers, as of representatives from the freeholders of each county, and from the burgesses of many towns and less considerable places, forming the lower or commons' house. (2) The previous assent and authority of the same assembly were necessary for every new law, whether of a general or temporary nature. (3) No man could be committed to prison but by a legal warrant specifying his offense; and, by usage nearly tantamount to constitutional right, he must be speedily brought to trial by means of regular sessions of gaol delivery. (4) The fact of guilt or innocence on a criminal charge was determined in a public court, and in the county where the offense was alleged to have occurred, by a jury of twelve men, from whose unanimous verdict no appeal could be made. Civil rights, so far as they depended on questions of fact, were subject to the same decision. (5) The officers and servants of the crown, violating the personal liberty or other right of the subject, might be sued in an action for damages to be assessed by a jury, or, in some cases, were liable to criminal process; nor could they

plead warrant or command in their justification, not even the direct order of the king.''

The author then enters upon a narration of the events and the methods by which the king undertook to break down these constitutional rights and establish a complete supremacy of kingly rule and royal prerogative. This struggle occupies much space, but has been summarized in the ''Genesis and Birth of the Federal Constitution,'' by Chandler, at pages 120 et seq. After setting forth the quotation above set out from Hallam, it is said:

''Those constitutional rights had more than once been violated by the crown, and some of them, notably the sixth, lay practically dormant, but Henry VII knew that to violate them now, jealously guarded as they were by Parliament and people, would be to court destruction. Great as was the political lethargy of the mass of the English people, intent as they were in this new day upon the acquisition of that wealth which came through trade and industry, the people understood, and Henry VII knew that they understood, the limitations of the royal power. Many men well knew what Sir John Fortescue, chief justice of the King's Bench under Henry VI, had so admirably expressed in his treatise, 'De Laudibus Angliæ,' written for the instruction of the then Prince of Wales, when, with much other, he said:

'' 'As the head of a body natural cannot change its nerves and sinews, cannot deny to the several parts their proper energy, their due proportion and aliment of blood, neither can a king who is the head of the body politic change the laws thereof, nor take from the people what is theirs by right against their consent. Thus you have, sir, the formal institution of every political kingdom, from whence you may guess at the power which a king may exercise with respect to the laws and the subject. For he is appointed to protect his subjects in their lives, properties, and laws; for this very end and purpose he has the delegation of power from the people, and he has no just claim to any other power but this.'

"We have said that men well knew these principles. Let us hasten to add that they highly valued them as well, and would right willingly have opposed by force of arms any open attempt to subvert them. The problems of government, then, that presented themselves to the first Tudor sovereign for solution were far from simple. If he would crush the few powerful feudal barons who had survived the Wars of the Roses, he must have the help of the people. To have the good will of the people he must show a respect for those recognized principles of constitutional law just mentioned, and, in short be (what would in other times have seemed a contradiction in terms) a law-abiding king.

"His course was soon decided upon, and carefully followed throughout his reign. The masses of the people of England resented the collection of direct taxes for the royal treasury; he would raise the necessary supplies by indirect methods and largely from the pockets of the rich. The Parliament was a powerful body and was jealous of its powers and its privileges; the less frequent its meeting, the better. As to the courts, no Englishman should evince a more scrupulous regard for the forms of law than England's king. Englishmen longed to turn from war to trade; he would lead the way, and would maintain that peace necessary to the change. Englishmen were weary of the feudal barons and their outworn claims to superiority; he would set himself in fearless opposition to the barons as a class, and in their stead would raise up a nobility composed of men whose ways of living and thinking were better suited to the times.

"All of these things Henry VII did. In his long reign of twenty-four years he summoned but seven Parliaments. The bulk of the public revenue he raised by indirect methods and by heavy exactions from the rich. He never asserted himself to be above the law, but was at all times careful to observe its forms. Relentless in stamping out opposition by the barons, he was ever solicitous of the progress and welfare of his people.

He exerted himself to promote trade and industry, and studiously avoided the waste of war. Finding the law courts too weak to cope with the barons, he created the court of the star chamber, and before that tribunal, which was bound by no rules of procedure and hampered by no precedents, the haughtiest noble was powerless. As a result, he left to Henry VIII 'a secure throne, a full treasury, and a prosperous people. . . .'

· "Having completely destroyed the last vestige of the power of the feudal barons, he recognized in Parliament the only possible obstacle to the absolute power of the crown. Determined as he was to inaugurate that despotism which he believed necessary to the welfare of both himself and his kingdom, he clearly saw that constitutional forms must be observed. Convinced that Parliament could not be successfully opposed, he determined to make it the instrument of his will. This he did. In the thirty-eight years of his reign he summoned nine Parliaments. These Parliaments he 'packed' by the creation of 'rotten' boroughs, by conferring on boroughs increased representation in the House of Commons, by interference in elections, and by other corrupt practices too numerous to mention here. . . .

"And so, by fraud, by favor, by every evil means save open intimidation, Parliament became the creature of the king, and well did it remember its creator. . . . When the courts declared the royal proclamations to be . without legal effect on his subjects, Parliament solemnly declared that royal proclamations issued with the consent of a majority of the king's council should have the force and effect of law. This last was fatal. When Parliament declared that a mere proclamation should have the force of statute law, it had nothing more to give. Its surrender was complete in that quarter. It was a return to the absolutism of William the Norman by legislative enactment and representative government was paralyzed—wounded in the house of its friends.
. . .

"Henry VIII, by proclamation, regulated religious ceremonies, fixed the prices of provisions, and forbade, under penalty of being sent to row as a slave in the galleys, the spreading of false news. Mary, by proclamation, forbade any person to have in his possession any 'heretical or seditious book' on pain of death. Elizabeth threatened vagrants with death, banished anabaptists from the realm, commanded all Irishmen to depart into Ireland, forbade the exportation of money, corn, and other commodities, and prohibited the erection of houses within three miles of London. She further regulated printers and printing, and directed that no book be published without the approval of the Archbishop of Canterbury and the Bishop of London. As this practice of royal legislation undermined the structure of the constitution, more than one warning voice was raised, but it was lost in the tumult of applause that greeted the progress of the Queen under whose rule England was becoming rich and powerful. . . .

"As the years passed there came to prevail an idea that the sovereign had a power to ordain, a legislative power of his own, and this idea grew in strength until it was given correct expression by James I when he said:

" 'As it is blasphemy for man to dispute what God may do in the plenitude of his omnipotence, so it is sedition for subjects to dispute what a king may do in the fullness of his power.' "

It is an interesting but melancholy study to trace the encroachment of the king upon the people's rights and to consider the great wrongs that were perpetrated in the name of the law, though such law was not rightfully enacted. The court of star chamber was not an open court, and a person being tried in that court had none of the rights of the common law. It was secret in its methods, and terrible in its results. It was not only used to break the power of the haughty barons, but became a power oppressive to the people. None of the common-law rights and procedure were observed therein, except

such as the court might see proper to observe in a particular instance. The power built up during the reigns of the Tudors and Stuarts was not easily overcome, and the struggle went on for several hundred years, and finally the rights of ancient Englishmen were recognized, and the Bill of Rights in 1689 was passed by Parliament, and recognized by the new king set up at the end of this great struggle. The rights of Englishmen, however, secured though they were by statute, were frequently disregarded by the King and his ministers, but finally in the case of *Entick* v. *Carrington,* 19 How. St. Tr. 1030, 24 King's Bench, 275, 95 English Reports, Reprint, 807, and other cases referred to in our former opinions, it was firmly and clearly established by the courts that searches without search warrants particularly describing the places to be searched and the person or thing to be seized were illegal, and that arrest without warrant founded upon an affidavit was illegal, except for felonies and for misdemeanors committed in the presence of the officers. It was intended to forever secure these rights against encroachments by the officers of the law by crystallizing these rights in the Constitution and giving them the force of supreme law. People may, of course, tear down their Constitution and reconstruct their government, but, if they will carefully study the origin and history of these provisions, they will be slow to do so, even though a few criminals may escape merited punishment by adhering to the Constitution.

The judgment of the court below will therefore be reversed and the case remanded.

*Reversed and remanded.*